IN THE COURT OF APPEALS OF NORTH CAROLINA

 No. COA17-405

 Filed: 6 March 2018

Wake County, No. 14 CRS 204947

STATE OF NORTH CAROLINA

 v.

KENNETH WILLIAM MILLER

 Appeal by Defendant from judgment entered 8 April 2016 by Judge Michael R.

Morgan in Superior Court, Wake County. Heard in the Court of Appeals 2 October

2017.

 Attorney General Joshua H. Stein, by Assistant Attorney General David D.
 Lennon, for the State.

 Chetson Hiltzheimer, PLLC, by Damon Chetson, for Defendant.

 McGEE, Chief Judge.

 I. Brief Factual Background

 Kenneth William Miller (“Defendant”) and his wife, Heather Miller (“Heather”)

drove their golf cart (the “golf cart”) from their house (the “house”) to a nearby bar

called Bones’ Place (“Bones”) on the evening of 1 March 2014 to hear a band.

According to the evidence taken in the light most favorable to Defendant, there was

a path between the house and Bones that permitted the drive to be conducted without

travelling on any public roadways. At approximately midnight, Heather decided she

wanted to leave Bones. Defendant went outside while Heather went to the restroom,
 STATE V. MILLER

 Opinion of the Court

and an altercation occurred between Defendant and some men in the Bones parking

lot (the “parking lot”). When Heather walked out of Bones and onto the parking lot,

she witnessed the altercation. The situation escalated and one of the men drew a

handgun and threatened Defendant, causing Defendant and Heather to get into the

golf cart, and Defendant then drove away from the parking lot.

 Wake County Sheriff’s Deputy Joshua Legan (“Deputy Legan”) was on patrol

shortly after midnight on 2 March 2014, when he observed the golf cart heading

toward him. Deputy Legan testified that the golf cart was being driven without lights

and was straddling the center line on Old U.S. Highway 1. Deputy Legan

immediately turned around and drove to intercept the golf cart. By the time Deputy

Legan activated his lights and caught up to the golf cart, it had turned off of the

highway onto a dirt path. Deputy Legan noticed the odor of alcohol emanating from

Defendant and that Defendant’s speech was slurred and his eyes were “red and

bloodshot[.]” Additional deputies arrived at the scene. Defendant was administered

tests for impairment and, based upon all the factors Deputy Legan observed,

Defendant was arrested for driving while impaired and driving left of the center line.

 Defendant was found guilty of driving while impaired and responsible for

driving left of center in district court on 11 June 2015, and he appealed to superior

court. Defendant was tried before a jury at the 6 April 2016 session of Wake County

Superior Court, and was again found guilty of driving while impaired and responsible

 -2-
 STATE V. MILLER

 Opinion of the Court

for driving left of center. Defendant appeals. Additional relevant facts will be

discussed in the analysis portion of this opinion.

 II. Analysis

 In Defendant’s sole argument, he contends the trial court erred by refusing to

instruct the jury on the defense of necessity when the evidence presented at trial

supported giving the instruction. We agree.

 A. Case Law

 The affirmative defense of necessity is available to defendants charged with

driving while under the influence (“DWI”). State v. Hudgins, 167 N.C. App. 705, 710

606 S.E.2d 443, 447 (2005). As an affirmative defense, “the burden rests upon the

defendant to establish this defense, unless it arises out of the State’s own evidence,

to the satisfaction of the jury.” State v. Caddell, 287 N.C. 266, 290, 215 S.E.2d 348,

363 (1975). It is well established:

 A trial court must give a requested instruction if it is a
 correct statement of the law and supported by the evidence.
 “Any defense raised by the evidence is deemed a
 substantial feature of the case and requires an
 instruction.” For a particular defense to result in a
 required instruction, there must be substantial evidence of
 each element of the defense when viewing the evidence in a
 light most favorable to the defendant. “Substantial
 evidence is ‘such relevant evidence as a reasonable mind
 might accept as adequate to support a conclusion.’”

State v. Brown, 182 N.C. App. 115, 117–18, 646 S.E.2d 775, 777 (2007) (citations

omitted) (emphasis added). However, “‘a trial court is not obligated to give a

 -3-
 STATE V. MILLER

 Opinion of the Court

defendant’s exact instruction so long as the instruction actually given delivers the

substance of the request to the jury.’” State v. Holloman, 369 N.C. 615, 625, 799

S.E.2d 824, 831 (2017) (citations omitted). Further,

 a trial judge’s jury charge shall “give a clear instruction
 which applies the law to the evidence in such manner as to
 assist the jury in understanding the case and in reaching a
 correct verdict.” For that reason, “the judge has the duty
 to instruct the jury on the law arising from all the evidence
 presented.” In instructing the jury with respect to a
 defense to a criminal charge, “the facts must be interpreted
 in the light most favorable to the defendant.”

Id. at 625, 799 S.E.2d at 831 (citations omitted) (emphasis added).

 “A defendant must prove three elements to establish the defense of necessity:

(1) reasonable action, (2) taken to protect life, limb, or health of a person, and (3) no

other acceptable choices available.” Hudgins, 167 N.C. App.at 710–11, 606 S.E.2d at

447.

 The rationale behind the defense is based upon the public
 policy that “the law ought to promote the achievement of
 higher values at the expense of lesser values, and [that]
 sometimes the greater good for society will be accomplished
 by violating the literal language of the criminal law.” “[I]f
 the harm which will result from compliance with the law is
 greater than that which will result from violation of it, [a
 person] is justified in violating it.”

State v. Thomas, 103 N.C. App. 264, 265, 405 S.E.2d 214, 215 (1991) (citations

omitted) (alterations in original).

 -4-
 STATE V. MILLER

 Opinion of the Court

 The question before this Court, which we review de novo, is whether, when

viewed in the light most favorable to Defendant, substantial evidence was presented

at trial that Defendant took “(1) reasonable action, (2) taken to protect life, limb, or

health of a person, and (3) no other acceptable choices [were] available” to Defendant.

Hudgins, 167 N.C. App.at 710–11, 606 S.E.2d at 447. Therefore, if the evidence

presented at trial, viewed in the light most favorable to Defendant and ignoring all

contradictory evidence, was sufficient to permit the jury to reasonably infer the

existence of these three elements, the trial court was required to give the instruction

on necessity. It would then be the sole province of the jury to determine whether,

based upon those facts, Defendant had met his burden of proving necessity to the

satisfaction of the jury:

 [Our appellate] cases enunciate and reiterate the rule –
 established in our law for over one hundred years, – that
 when the burden rests upon an accused to establish an
 affirmative defense . . . the quantum of proof is to the
 satisfaction of the jury – not by the greater weight of the
 evidence nor beyond a reasonable doubt – but simply to the
 satisfaction of the jury. Even proof by the greater weight of
 the evidence – a bare preponderance of the proof – may be
 sufficient to satisfy the jury, and the jury alone determines
 by what evidence it is satisfied.

State v. Freeman, 275 N.C. 662, 666, 170 S.E.2d 461, 464 (1969) (citations omitted).

 We now address a potential issue that arises from the present appeal. During

the charge conference, Defendant requested that the trial court give an instruction

on necessity and duress, but specifically requested N.C.P.I. Crim. 310.10, the

 -5-
 STATE V. MILLER

 Opinion of the Court

instruction for “Compulsion, Duress, or Coercion.” In North Carolina, there is no

pattern jury instruction that expressly addresses the defense of necessity. At the

charge conference, both Defendant and the State discussed a recent unpublished

opinion of this Court, State v. Badson, 242 N.C. App. 384, 776 S.E.2d 364, 2015 WL

4430202 (2015) (unpublished).1 In Badson, this Court stated: “Although the defenses

of duress and necessity were ‘historically distinguished’ under common law, ‘[m]odern

cases have tended to blur the distinction[.]’ State v. Monroe, 233 N.C. App. 563, 565,

756 S.E.2d 376, 378 (2014). Thus, for purposes of this opinion, the two defenses are

discussed interchangeably.” Badson, 242 N.C. App. 384, 776 S.E.2d 364, 2015 WL

4430202 at *3.2 We note that the language quoted from Monroe is language

discussing federal law, not the law of North Carolina. Monroe, 233 N.C. App.at 565,

756 S.E.2d at 378 (2014). Further, in Badson this Court quotes Hudgins for the

proposition that the “defense of necessity is available in a DWI prosecution[,]”

Badson, 2015 WL 4430202 at *4 (citation omitted), and sets forth the elements of

necessity as found in Hudgins: “(1) reasonable action, (2) taken to protect life, limb,

or health of a person, and (3) no other acceptable choices available.” Id. (citation

omitted).

 The elements of duress have been stated as follows:

 1 In the transcript the case is identified as “State v. Batson;” however, it is clear that the case
discussed was Badson.
 2 See also State v. Smith, __ N.C. App. __, 791 S.E.2d 544, 2016 WL 6081424, at *3 (2016)

(unpublished opinion conflating duress and necessity).

 -6-
 STATE V. MILLER

 Opinion of the Court

 “In order to successfully invoke the duress defense, a
 defendant would have to show that his ‘actions were caused
 by a reasonable fear that he would suffer immediate death
 or serious bodily injury if he did not so act.’” Furthermore,
 a defense of duress “cannot be invoked as an excuse by one
 who had a reasonable opportunity to avoid doing the act
 without undue exposure to death or serious bodily harm.”

State v. Smarr, 146 N.C. App. 44, 54–55, 551 S.E.2d 881, 888 (2001) (citations

omitted). The pattern jury instruction for compulsion, duress, or coercion states,

partially tracking the language of Smarr and other opinions involving duress:

 310.10 COMPULSION, DURESS, OR COERCION.

 There is evidence in this case tending to show that the
 defendant acted only because of [compulsion] [duress]
 [coercion]. The burden of proving [compulsion] [duress]
 [coercion] is upon the defendant. It need not be proved
 beyond a reasonable doubt, but only to your satisfaction.
 The defendant would not be guilty of this crime if his
 actions were caused by a reasonable fear that he (or
 another) would suffer immediate death or serious bodily
 injury if he did not commit the crime. His assertion of
 [compulsion] [duress] [coercion] is a denial that he
 committed any crime. The burden remains on the State to
 prove the defendant’s guilt beyond a reasonable doubt.

N.C.P.I. Crim. 310.10 (emphasis added).

 We find no binding precedent supporting the proposition that duress and

necessity have ceased to be distinct defenses in North Carolina.3 In recognizing the

availability of the necessity defense in trials for DWI, this Court in Hudgins held that

 3 We note that on appeal, both Defendant and the State limit their arguments to whether the
trial court erred by failing to give an instruction on necessity, and do not discuss the defense of duress.

 -7-
 STATE V. MILLER

 Opinion of the Court

the defense of necessity was available based in part on the fact that other “common

law defenses are available in DWI prosecutions.” Hudgins, 167 N.C. App. at 709, 606

S.E.2d at 447. Countering the State’s argument that the necessity defense should

not be allowed, this Court held:

 The State’s argument cannot be reconciled with decisions
 of this Court indicating that common law defenses are
 available in DWI prosecutions. This Court recently held
 that “[i]n appropriate factual circumstances, the defense of
 entrapment is available in a DWI trial.” This Court has
 also implicitly acknowledged that the defense of duress
 would be appropriate in a DWI trial. See State v. Cooke, 94
 N.C. App. 386, 387, 380 S.E.2d 382, 382-83[.]

 Moreover, courts in other jurisdictions have specifically
 held that the defense of necessity is available in a DWI
 prosecution. We likewise hold that the defense of necessity
 is available in a DWI prosecution.

Id. at 709–10, 606 S.E.2d at 447 (citations omitted) (emphasis added). If necessity

and duress have ceased to be distinct defenses in North Carolina, this Court in

Hudgins could have simply cited Cooke as having implicitly established the viability

of the merged necessity/duress defense instead of relying on Cooke’s implicit

acceptance of the duress defense, along with this Court’s explicit recognition of the

defense of entrapment, in order to hold that the defense of necessity is also available

to defendants on trial for DWI. In addition, reference to the acceptance of necessity

as a defense to DWI in other jurisdictions would have been superfluous. We hold the

 -8-
 STATE V. MILLER

 Opinion of the Court

defense of necessity is recognized as a defense separate and distinct from the defense

of duress (compulsion or coercion).

 In the present case, both parties and the trial court, while discussing the

elements of the requested instruction at the charge conference, solely discussed the

elements of necessity as set forth in Badson – and thus Hudgins. However, the

elements in Hudgins do not track the language in N.C.P.I. Crim. 310.10, the pattern

jury instruction for duress. The State argued the required elements as follows: “That

it first must be a reasonable act taken to . . . protect the life, limb, or health of a

person. . . . . And to the third action, that [there] must be no other acceptable choices

available.” The State then suggested that this Court’s opinion in Cooke recognized a

fourth element: “That [D]efendant [continued to face] threatening conduct of any kind

at the time the officer saw him while driving while intoxicated.”

 Despite the fact that the elements discussed by the parties at the hearing were

those for necessity, the trial court, clearly relying on language from N.C.P.I. Crim.

310.10, denied Defendant’s request to instruct the jury on the defense of necessity

based upon its determination that no evidence had been presented demonstrating

that Defendant was in actual “fear” at the time he drove the golf cart on the highway:

 [THE COURT:] While the issue appears on it sure to be
 quite detailed and involved really, a look at the instruction
 makes it fairly simple in terms of the resolution here. The
 instruction 310.10 reads in pertinent part to the extent
 that it influences the decision here, quote:

 -9-
 STATE V. MILLER

 Opinion of the Court

....

[] [D]efendant would not be guilty of this crime if his
actions were caused by a reasonable fear that he or another
would suffer immediate death or serious bodily injury if he
did not commit the crime. Unquote.

Of course there is reasonable dispute concerning the length
of time that was involved here in terms of when that fear
still is recognized by the law to be present and existent in
terms of the length of time or the length of participation as
to where there was a fear that began as opposed to the
point where it was still considered to be ongoing until such
time as the deputy effected the stop here.

There’s also the aspect as to whether or not, as the [S]tate
argues as well, whether there was such a serious threat
that would connote immediate death or serious bodily
injury being a potential outcome but for [] [D]efendant’s
actions.

But all of that presupposes something that’s not even in
evidence, and that is, in terms of looking at the plain
language of the instruction, [] [D]efendant will not be guilty
of this crime if his actions were caused by reasonable fear.

There is no evidence that [] [D]efendant was in fear. There’s
evidence that the testimony was his wife was in fear, but
there’s no evidence that [] [D]efendant was in fear for me to
consider over this instruction being given, so as to
instruction about that, this point 310.30 will not be given
because there is no evidence that [] [D]efendant had a
reasonable fear which would have him to commit the
alleged crime.

....

[DEFENDANT’S COUNSEL:] To say that the only way
that [Defendant] can mount the defense is to actually hear
from [him] would be a violation of his right against self-

 - 10 -
 STATE V. MILLER

 Opinion of the Court

 incrimination.

 THE COURT: I didn’t say that [Defendant] had to testify
 that he was in fear. I said there is no evidence that he was
 in fear, whether that would come from him or anybody else
 that he was in fear. But you can make your statements for
 the record, but I’ve made the decision. (Emphasis added).

The trial court clearly considered there to be an additional element requiring that

Defendant was motivated by emotional “fear” to drive the golf cart on the highway.

Our case law does not include fear as an element of the defense of necessity. “A

defendant must prove three elements to establish the defense of necessity: (1)

reasonable action, (2) taken to protect life, limb, or health of a person, and (3) no other

acceptable choices available.” Hudgins, 167 N.C. App. at 710–11, 606 S.E.2d at 447

(citation omitted). Although Defendant’s mental state could be potentially relevant

in analyzing the required elements, fear itself is simply not an element of the defense.

 We are not called upon in the present appeal to determine whether “fear,” as

implicitly defined by the trial court in the present case – an emotional or mental state

– is an element of the defense of duress.4 However, in the interest of being thorough,

we compare the elements of the defenses of necessity and duress as set forth in

appellate opinions of this State. The elements of necessity are that the defendant

engaged in “(1) reasonable [though illegal] action, (2) taken to protect life, limb, or

 4 However, if the trial court in the present case correctly interpreted “fear” as it relates to
duress, and the instruction for duress, then the defenses of necessity and duress have clearly not
merged in North Carolina since necessity requires no proof of any state of mind.

 - 11 -
 STATE V. MILLER

 Opinion of the Court

health of a person, and (3) no other acceptable choices [were] available[.]” Hudgins,

167 N.C. App. at 710-11, 606 S.E.2d at 447 (citations omitted). The elements of

duress are (1) that a defendant’s illegal “‘actions were caused by [the defendant’s]

reasonable fear that [the defendant or another] would suffer’” (2) “‘immediate death

or serious bodily injury[,]’” (3) “‘if [the defendant had] not so act[ed][,]’” and (4) the

defendant had no “reasonable opportunity to avoid doing the [illegal] act without

undue exposure to death or serious bodily harm.” Smarr, 146 N.C. App. at 54–55,

551 S.E.2d at 888 (citations omitted). Both necessity and duress require that a

defendant demonstrate an absence of reasonable alternatives to the course of action

actually undertaken.5

 Though not expressly stated in any precedent that we have found, the manner

in which the elements of necessity are worded implies that they are analyzed

pursuant to an objective standard of reasonableness, not a subjective standard: “(1)

reasonable action, (2) taken to protect life, limb, or health of a person, and (3) no other

acceptable choices available.” Hudgins, 167 N.C. App. at 710–11, 606 S.E.2d at 447

(citation omitted). In potential contrast, the first element of duress, as established

 5 We make no attempt to answer whether the showing required to prove “no other acceptable
choices were available” to a defendant is the same as the showing required to prove a defendant had
no “reasonable opportunity to avoid doing the [illegal] act without undue exposure to death or serious
bodily harm.” We also note that N.C.P.I. Crim. 310.10 includes no express requirement that the jury
find an absence of reasonable alternatives: “The defendant would not be guilty of this crime if his
actions were caused by a reasonable fear that he (or another) would suffer immediate death or serious
bodily injury if he did not commit the crime.” N.C.P.I. Crim. 310.10.

 - 12 -
 STATE V. MILLER

 Opinion of the Court

by precedent and as presented in N.C.P.I. Crim. 310.10, suggests a subjective

standard — that the defendant acted based upon his “reasonable fear that [he or

another] would suffer immediate death or serious bodily injury” absent his actions.

Smarr, 146 N.C. App. at 54–55, 551 S.E.2d at 888 (citations omitted).

 This focus on a defendant’s “fear” makes sense in the context of duress, coercion

or compulsion, because this defense is generally used to justify the actions of a

defendant based upon intentional threats from a third party for the express purpose

of coercing the defendant to act in an illegal manner. For example, in State v. Cheek,

351 N.C. 48, 520 S.E.2d 545 (1999), our Supreme Court, in rejecting the defendant’s

duress argument, reasoned:

 Defendant contends that the Nelson diary was material to
 defendant’s defense because it supported defendant’s
 contention that Nelson was a violent person, which in turn
 supported defendant’s defense that he accompanied Nelson
 only out of fear. . . . .

 ....

 [T]he affirmative defense of duress, if proven, would serve
 as a complete defense to the kidnapping and robbery
 charges. In order to successfully invoke the duress defense,
 a defendant would have to show that his “actions were
 caused by a reasonable fear that he would suffer immediate
 death or serious bodily injury if he did not so act.”

 In the case sub judice, the record contains no evidence
 which indicates that defendant participated in the
 kidnapping and robbery of Oxendine as a result of coercion.
 During the extended course of the crimes against
 Oxendine, defendant had several opportunities to report

 - 13 -
 STATE V. MILLER

 Opinion of the Court

 that he had been forced by duress to commit these crimes
 and to seek help. The record shows that defendant went to
 New Hanover Hospital after the murder, where he could
 have sought help, but he failed to do so.

Id. at 61–62, 520 S.E.2d at 553 (citations omitted); see also State v. Shields, COA17-

69, 2017 WL 6460104, at *4 (2017) (unpublished opinion) (“defendant presented

evidence that he remained afraid of Travis even after he entered the home with the

other men, and that his continued fear precluded any reasonable opportunity to

retreat”).

 Necessity, however, tends to be used to excuse actions that were based upon a

defendant’s reasonable response to some event or occurrence, not necessarily

involving a third-party, that threatens the life or health of any person. For example,

in Hudgins, the defendant was convicted of driving while impaired, but argued that

the trial court should have instructed the jury on the defense of necessity. Hudgins,

167 N.C. App. at 708, 606 S.E.2d at 446. According to the defendant’s evidence, he

was intoxicated, but was being driven home by his sober friend “Maney,” in Maney’s

truck, when Maney pulled off the road and stopped to examine a fallen tree. Id. at

707, 606 S.E.2d at 445. While both Maney and the defendant were outside the truck,

the defendant “looked back and saw that the truck was rolling. Id. He ran to the

truck, jumped in the passenger door, slid over to the driver’s side, and unsuccessfully

tried to stop the truck[,]” which ended up hitting another vehicle and a house. Id.

The defendant’s actions in Hudgins were clearly not the result of coercion by a third-

 - 14 -
 STATE V. MILLER

 Opinion of the Court

party, nor the result of fear of any bodily harm to himself. Id. In fact, the defendant’s

actions removed the defendant from a place of safety and placed him in a place of

physical danger. Id. at 711, 606 S.E.2d at 448 (“The fact that defendant and Maney

were themselves safely out of harm’s way, as the State argues, is irrelevant if the jury

believed that defendant’s actions were necessary to protect others.”).

 In Hudgins, this Court held that the evidence, taken in the light most favorable

to the defendant, was sufficient to allow a proper inference that he acted reasonably

under the circumstances – for the purpose of protecting others from the runaway

truck – and that no other acceptable choices were available. Id. at 711–12, 606 S.E.2d

at 448 (“because the record contains substantial evidence of each element of the

necessity defense, the trial court should have instructed the jury on that defense”).

 Presumably, in the present case, Defendant requested N.C.P.I. Crim. 310.10

because no specific North Carolina Pattern Jury Instruction exists for the defense of

necessity. Although Defendant could have requested a non-pattern jury instruction

correctly stating the elements of necessity, it was not fatal to his argument that he

failed to do so. “[A] trial judge [is] not . . . relieved of his duty to give a correct

. . . instruction, there being evidence to support it, merely because [a] defendant’s

request was not altogether correct.” State v. White, 288 N.C. 44, 48, 215 S.E.2d 557,

560 (1975) (citation omitted). With these issues in mind, we look de novo to determine

 - 15 -
 STATE V. MILLER

 Opinion of the Court

whether there was evidence sufficient to support Defendant’s requested necessity

instruction.

 B. Additional Facts

 The evidence viewed in the light most favorable to Defendant was as follows:

Defendant and Heather lived in close proximity to Bones. There were “paths” that

connected the house with Bones, and it was possible to travel between the house and

Bones without ever travelling on any public roadway. Defendant and Heather had

utilized the paths on multiple prior occasions, either by walking or by driving the golf

cart. The purpose of utilizing the golf cart and the paths was to avoid driving a car,

and further to avoid the use of public roadways, after consuming alcohol. Bones

attracted varied clientele, and had become “kind of a rough place” where there could

be “fights and it was just very unpredictable.” Deputy Legan testified that he had

known Bones “to be an establishment that serves the biker crowd.”

 Defendant and Heather arrived at Bones’ parking lot in the golf cart at

approximately 9:30 p.m. on 1 March 2014. Heather testified that they planned on

returning home “[t]he same way we came. I knew I probably would be driving the

golf cart home, but just the same we came through the back path.” Heather testified

that she would probably drive home because it was likely that Defendant would drink

more alcohol than she. According to Heather, as the night progressed the atmosphere

at Bones “became intense; it became kind of mean. It just wasn’t a place I wanted to

 - 16 -
 STATE V. MILLER

 Opinion of the Court

be in anymore.” Heather testified that while at Bones – a period of less than three

hours – she consumed “more than four, less than seven” alcoholic drinks, and that

she did not eat anything during that time because she had eaten dinner before leaving

the house that evening. Defendant and Heather decided to leave shortly after

midnight, 2 March 2014, and Heather went to the restroom while Defendant went

outside to wait for her.

 When Heather walked out of Bones, she noticed Defendant was in the parking

lot arguing with “several guys” that she did not know. There were at least three men

with whom Defendant was arguing, and there may have been as many as five. The

arguing was intense, involving shouting and cursing, and Defendant eventually

punched one of the men (“the man”), who was in his “late 20s, maybe early 30s[,]”

causing the man to fall to the ground. Defendant later described the man to Deputy

Legan as “the baddest motherf_cker in the bar[.]” Heather further testified that when

the man “got up he was extremely red-faced and he pulled a gun from his waistband”

and “[r]aised it in the air.” Heather testified that Defendant did not have a gun and,

that as far as she knew, Bones did not have security guards or bouncers. Heather

testified:

 It got very, very chaotic at that point. There was a woman
 [who] was next to me who was – she said “you need to get
 out of here. He’s crazy.”6 [Defendant] had turned around
 and was screaming at me “go, go, go, go, go.” We got going.

 6 The woman was referring to the man with the gun.

 - 17 -
 STATE V. MILLER

 Opinion of the Court

 When [the man] pulled the gun I just wanted to get out of
 there.

Heather further testified that, after the man raised the gun, she started screaming

and just “wanted to get out.” When she saw the gun she wanted “[j]ust to get away.

To get – to get away. That’s all I wanted.” Heather testified that she was “not a

runner” because she had “broken [her] leg area” at some time in the past.

 At trial, the following colloquy transpired between Heather and Defendant’s

attorney:

 Q. Are you aware of what [sic] he was going to shoot at you,
 or anyone else for that matter, do you recognize at this
 point that [Defendant] was sort of the target of this guy?

 A. Yes.

 Q. What did you do next?

 A. I got in the golf cart and we left.

 Defendant still had the keys to the golf cart, so he got behind the wheel and

Heather got in the passenger seat. The parking lot was packed with vehicles and

people, which prevented Defendant from driving around the back of Bones toward

the path they had taken from the house earlier that evening. Heather was not really

thinking about what direction they should drive because she was still focused on the

“altercation” that had just taken place; however, she saw that the way to the back

path was blocked and therefore “was not the fastest out.” Defendant “pulled out of

the parking lot the only way we could in the golf cart.” When asked on cross-

 - 18 -
 STATE V. MILLER

 Opinion of the Court

examination whether she believed it was safer for them to drive the golf cart through

the parking lot and onto the road instead of running away, Heather stated: “The golf

cart can go faster than I can go. It was a split-second decision and it seemed the only

option.” Heather was asked the following, and then answered:

 Q. . . . Do you have any doubt that had you not taken the
 actions that [Defendant] and you took that evening in
 getting into that golf cart and fleeing through the open area
 of the parking lot, that you might have been hurt or killed
 by that person who pulled the gun?

 A. I have no doubt.

 Heather testified that she did not notice Deputy Legan until after they had

turned off the road and onto the dirt path to head home. She stated: “We went along

the road along the clump of trees and then on to the dirt path and that’s where we

were pulled over.” Where they had turned onto the dirt path was a short distance

from Bones’ parking lot, and Heather first saw Deputy Legan “within minutes” of the

altercation in the parking lot. Although she did not know, Heather assumed they had

been pulled over initially because of the altercation in the Bones’ parking lot.

 Deputy Legan testified that he passed Defendant driving the golf cart on Old

U.S. 1, turned around in the Bones parking lot, which was crowded, then pulled up

behind Defendant after Defendant had turned the golf cart off the highway and onto

a dirt path that connected Old U.S. 1 to Friendship Road. Deputy Legan testified

that the distance from Bones parking lot to where Defendant stopped “was no more

 - 19 -
 STATE V. MILLER

 Opinion of the Court

than point two-tenths of a mile[,]” and that Defendant was stopped “maybe fifty to a

hundred feet” down the dirt path connecting Old U.S. 1 highway to Friendship Road.

A map of the relevant area, introduced for illustrative purposes, shows that the

distance from the north end of the parking lot to the dirt path was just over 500 feet,

or approximately one-tenth of a mile, and the spot marked on the map as the place

Deputy Legan first contacted Defendant was approximately fifty feet down the dirt

path.

 Heather testified that after being pulled over:

 It was all happening so fast. It was just very chaotic. I was
 telling the deputy what I was thinking. I told him
 everything that just happened.

 Q. When you say “everything” what does that mean?

 A. The fight, the gun, the chaos.7

 Q. Did you think that there was any other reasonable
 solution to what you and [Defendant] did in fleeing?

 A. No, I don’t.

 Q. Had you been able to get back through that grass, – was
 that your intention, to drive through the night, you know,
 either have you drive or [Defendant] drive on a grass path?

 A. The way we came, yes.

 Q. You have cars, actual cars?

 7 On cross-examination, Heather appears to contradict this testimony that she had told a
deputy about the fight and the gun, but because we are reviewing the evidence in the light most
favorable to Defendant, we do not consider that testimony. Contradictions in the evidence and issues
of credibility were for the jury to decide.

 - 20 -
 STATE V. MILLER

 Opinion of the Court

 A. Vehicles, yes.

 Q. Why did you choose to drive basically a glorified golf cart
 on that evening?

 A. Because it was not far. It’s, you know, a close drive and
 if we’re going to be drinking it’s probably the smarter thing
 to do.

 Heather testified that she did not talk much to the deputies because she “was

crying and was upset[.]” Heather did not know if Defendant discussed the gun with

the deputies, but she clearly heard Defendant tell them about the fight. Deputy

Legan testified Defendant stated he had been in an altercation and that Deputy

Legan would probably be receiving a call about it. Deputy Legan testified that

Defendant had referred to the man as “the baddest motherf_cker in the bar[,]” and

“seemed a bit agitated” at the time. Defendant exercised his right not to testify at his

trial.

 C. Elements of Necessity

 1. Reasonable Action Taken to Protect Life, Limb, or Health

 We address the first two elements of the defense of necessity – (1) reasonable

action (2) taken to protect life, limb, or health of a person – together. Defendant did

not testify at trial; therefore, all evidence relating to the reasonableness of the actions

he took, and the legitimacy of his concerns that people’s lives were in jeopardy, was

introduced through the testimony of Heather and Deputy Legan. When viewed in

 - 21 -
 STATE V. MILLER

 Opinion of the Court

the light most favorable to Defendant, this testimony indicated the following: Bones

attracted a potentially rough clientele, including, according to Deputy Legan, “the

biker crowd.” It was not unusual for fights to break out between patrons, but Bones

employed no obvious security. While Defendant was at Bones for close to three hours

on the evening of 1 March 2014 and into the early morning of 2 March 2014, the

atmosphere in Bones became increasingly “intense” and “mean” to a degree that

Heather testified she wanted to leave, and Defendant agreed that they should do so.

Defendant got into an argument with between three and five men in the Bones’

parking lot which escalated from arguing to shouting and cursing. The main

individual with whom Defendant was arguing, “the man,” was in his late twenties to

early thirties, and Defendant described him as “the baddest motherf_cker in the

bar[.]” This altercation escalated to the point that Defendant punched the man,

knocking him to the ground. The man got back up, “extremely red-faced,” drew a

handgun from his waistband, and threatened Defendant. Neither Defendant nor

Heather were armed.

 In response to the man’s threatening actions with the gun, the scene turned

“chaotic.” A woman nearby told Heather – and likely Defendant as well – that the

man was “crazy” and they needed to “get out of [t]here.”8 Heather started screaming,

and just wanted to get away from what was clearly a dangerous and volatile situation.

 8The jury was free to make the inference that Defendant, who was standing next to Heather,
would have heard these comments too.

 - 22 -
 STATE V. MILLER

 Opinion of the Court

Heather testified to the obvious concern that the man might shoot Defendant, her, or

someone else with his gun, and further testified that Defendant would have been the

most obvious potential target. When Defendant became aware of the gun, and the

obvious danger associated with a man he had just assaulted brandishing a firearm,

he “screamed” at Heather “go, go, go, go, go.” During her testimony, Heather stated

that she had “no doubt” that had she and Defendant “not taken the actions that [they]

took that evening in getting into [the] golf cart and fleeing through the open area of

the parking lot, that [they] might have been hurt or killed by [the man] who pulled

the gun[.]” Deputy Legan testified that Defendant “seemed agitated” when speaking

with Deputy Legan immediately after the incident, and that Defendant described the

man with the gun as “the baddest motherf_cker in the bar.”

 As our Supreme Court has stated:

 Circumstantial evidence and direct evidence are subject to
 the same test for sufficiency, and the law does not
 distinguish between the weight given to direct and
 circumstantial evidence. . . . .

 Circumstantial evidence is often made up of independent
 circumstances that point in the same direction. These
 independent circumstances are like

 “strands in a rope, where no one of them may be
 sufficient in itself, but all together may be strong
 enough to prove the [element at issue]. . . . [E]very
 individual circumstance must in itself at least tend to
 prove the [relevant element] before it can be admitted
 as evidence.

 - 23 -
 STATE V. MILLER

 Opinion of the Court

State v. Parker, 354 N.C. 268, 279, 553 S.E.2d 885, 894 (2001) (citations omitted).

Further, “[t]his Court has held that it is fundamental to a fair trial that a witness’s

credibility be determined by a jury,” State v. Crabtree, __ N.C. App. __, __, 790 S.E.2d

709, 715 (2016) (citation omitted), and issues of common sense are for the jury to

decide. State v. Zuniga, 320 N.C. 233, 251, 357 S.E.2d 898, 910 (1987). This Court

cannot decide issues of credibility, must take all proper testimony favorable to

Defendant as true, and resolve any conflict in the evidence in Defendant’s favor.

 When viewed in the light most favorable to Defendant, we hold that

substantial evidence was presented that could have supported a jury determination

that a man drawing a previously concealed handgun, immediately after having been

knocked to the ground by Defendant, presented an immediate threat of death or

serious bodily injury to Defendant, Heather, or a bystander, and that attempting to

escape from that danger by driving the golf cart for a brief period on the highway was

a reasonable action taken to protect life, limb, or health. Hudgins, 167 N.C. App. at

710-11, 606 S.E.2d at 447, see also Cooke, 94 N.C. App. at 387, 380 S.E.2d at 382–83

(evidence that the defendant “drove the vehicle away from a drunken party in the

country because several irate people were chasing him on foot” “tend[ed] to show that

defendant was justifiably in fear for his safety when he drove away from his

pedestrian pursuers”).

 - 24 -
 STATE V. MILLER

 Opinion of the Court

 Further, even assuming arguendo that “fear” of some sort is an element of

necessity, we hold that substantial evidence was presented at trial upon which the

jury could have made a common sense determination that a reasonable person in

Defendant’s position would become frightened by the appearance of a gun in the hand

of the man Defendant had just punched in the face. Based on the evidence presented

at trial, the jury could have reasonably inferred that Defendant was afraid for his life,

Heather’s life, or the lives of others present in the parking lot, and that this fear was

objectively reasonable. Because substantial evidence of these two elements was

produced at trial, final determination of “[w]hether [Defendant’s actions were]

reasonable under the circumstances . . . w[as a] question[] for the jury.” Hudgins,

167 N.C. App. at 711, 606 S.E.2d at 448.

 2. No Other Acceptable Choices

 We now review the record to determine if substantial evidence was presented

at trial from which the jury could have determined that there were “no other

acceptable choices available” to Defendant at the time he chose to drive the golf cart

while intoxicated. Id. at 711, 606 S.E.2d at 447 (citation omitted). This element is

closely associated with the “reasonable action” element, and we include our analysis

above in our analysis of this element.

 Initially, the State, in its argument, relies on evidence favorable to the State

while discounting evidence favorable to Defendant, which is not permissible on

 - 25 -
 STATE V. MILLER

 Opinion of the Court

appellate review. Brown, 182 N.C. App. at 117–18, 646 S.E.2d at 777. For example,

the State argues that Defendant (and Heather) were capable of running and that the

golf cart could not travel much more than five miles-per-hour. Based upon this

evidence favorable to the State, the State argues that Defendant and Heather should

have run away instead of having Defendant drive, or that, if Defendant was going to

drive, he should have taken a route that did not involve the highway. However,

Heather testified they would have driven the golf cart back the way they had come

had that had been an option – and thereby would have avoided driving on the

highway – but the route that would have allowed them to avoid driving on the

highway was blocked by automobiles and people. Heather testified she did not believe

there “was any other reasonable solution to what [she and Defendant] did in

fleeing[.]” Heather also testified that Defendant “pulled out of the parking lot the

only way we could in the golf cart.” (Emphasis added).

 In support of another argument, the State improperly quotes Deputy Legan’s

testimony that Heather did not appear to have been intoxicated. The State argues

that even if it was reasonable to use the golf cart to get away, and even if the only

available open route was onto the highway for at least a brief period, it should have

been the more sober Heather, not Defendant, who did the driving. However, there

was evidence presented strongly suggesting Heather would have been intoxicated at

the relevant time, and it was for the jury, not the trial court, to weigh that evidence.

 - 26 -
 STATE V. MILLER

 Opinion of the Court

Heather testified that while at Bones – a period of less than three hours – she

consumed “more than four, less than seven” alcoholic drinks, and that she did not eat

anything during that time because she had “eaten dinner before leaving the house

that evening.” The jury could use their common sense and lay knowledge to

determine that Heather was also likely intoxicated at the time of the incident.

Defendant’s evidence was that he had the keys to the golf cart; that he was a military

veteran trained to make quick, reasoned decisions in a crisis; that Heather was

panicking, as evidenced by her testimony that she was screaming and not really

focusing on anything other than the desire to get away; that Defendant instigated

their departure from the scene by yelling at Heather “go, go, go, go, go.”

 At the charge conference, the State argued the following in support of denying

the necessity instruction:

 Well, [Defendant’s] witness[] has stated there was nothing
 else we could do. It’s still in the [trial c]ourt’s view to
 analyze the circumstances and come to that same
 conclusion. In this case it’s not been shown why it was not
 simply available to these individuals who their own
 witness testified we can both run. The bar was still – that
 they could have gone back into the bar or simply run and
 disperse into this crowd of people.

It was not the province of the trial court to analyze the evidence and come to a

conclusion concerning whether driving away in the golf cart constituted a reasonable

option for Defendant, or whether running into the crowd, or back into Bones,

constituted viable alternatives to driving away in the golf cart. Those decisions, based

 - 27 -
 STATE V. MILLER

 Opinion of the Court

on credibility analysis and weighing of the evidence, were the sole province of the

jury. The only role of the trial court at that point was to determine whether sufficient

evidence had been admitted upon which the jury could decide in favor of Defendant

on those contested issues. Though the jury might have rejected some or all of the

testimony favorable to Defendant, it was the province of the jury to make those

determinations. Just like the trial court in this instance, this Court cannot make any

determinations concerning the weight to be given Defendant’s evidence, or the

credibility of any witness. After reviewing the facts before us in the light most

favorable to Defendant, we hold that Defendant met his burden of introducing

“evidence that a reasonable person would find sufficient to support” the “no other

acceptable choices” element. Hudgins, 167 N.C. App. at 709, 711, 606 S.E.2d at 446-

47 (citations omitted).

 3. Abatement of the Perceived Danger

 We further hold there was substantial evidence from which the jury could

determine that a reasonable person in Defendant’s position could have maintained

the concern that both Defendant’s and Heather’s lives were in jeopardy, and further

maintained the concern that the danger had not clearly abated by the time Deputy

Legan stopped the golf cart. In Cooke, supra, involving the defense of duress, the

defendant presented evidence “that he drove the vehicle away from a drunken party

 - 28 -
 STATE V. MILLER

 Opinion of the Court

in the country [while intoxicated] because several irate people were chasing him on

foot[.]” Cooke, 94 N.C. App. at 387, 380 S.E.2d at 382. This Court held on those facts:

 [Evidence was presented that the defendant] had been
 driving on different public highways for about thirty
 minutes when the officer stopped him. While this evidence
 tends to show that defendant was justifiably in fear for his
 safety when he drove away from his pedestrian pursuers, it
 does not tend to show that he was still justifiably fearful
 thirty minutes later after his pursuers had been left many
 miles behind. [N]othing in the record suggests that
 defendant would have exposed himself to harm of any kind
 if he had stopped driving the car long before the officer saw
 him.

Id. at 387, 380 S.E.2d at 382–83 (emphasis added) (citations omitted); see also State

v. Kapec, 234 N.C. App. 117, 761 S.E.2d 754, 2014 WL 2116530, *5 (2014)

(unpublished) (Distinguishing Cooke, and holding evidence was sufficient to require

an instruction on the defense of necessity: “[W]e do not agree with the State that the

result in this case is controlled by State v. Cooke. In Cooke, the defendant was stopped

by police after ‘he had been driving on different public highways for about thirty

minutes.’ We held that although the ‘evidence tends to show that defendant was

justifiably in fear for his safety when he drove away from his pedestrian pursuers,’

there was no evidence that ‘he was still justifiably fearful thirty minutes later after

his pursuers had been left many miles behind.’ In this case, defendant was stopped

by Officer Mobley about three blocks from Mr. Cayson’s house and within five

 - 29 -
 STATE V. MILLER

 Opinion of the Court

minutes of leaving. Cooke is factually distinguishable and does not control the

outcome of the present case.”).

 In the present case, Deputy Legan testified that Defendant had pulled off the

highway approximately two-tenths of a mile from Bones’ parking lot, and Heather

testified that she saw Deputy Legan “within minutes” after the altercation in the

parking lot. On the facts of this case, including the fact that Defendant’s evidence

was that there was a man with a firearm who had threatened to shoot Defendant,

and who would likely have access to a vehicle, we hold two-tenths of a mile was not,

as a matter of law, an unreasonable distance to drive before pulling off the highway.

That determination should have been made by the jury following a correct instruction

on the defense of necessity.

 4. Duress

 Finally, were we to conduct our analysis applying the elements of duress, the

result would not change. We hold that there was substantial evidence, when viewed

in the light most favorable to Defendant, to have supported a jury determination that

(1) Defendant’s “‘actions [briefly driving the golf cart on the highway while

intoxicated] were caused by [Defendant’s] reasonable fear that [Defendant or

another] would suffer [(2)] immediate death or serious bodily injury[,]” (3) had

Defendant did not taken those actions, and (4) Defendant had no “reasonable

 - 30 -
 STATE V. MILLER

 Opinion of the Court

opportunity to avoid doing the act without undue exposure to death or serious bodily

harm.” Smarr, 146 N.C. App. at 54–55, 551 S.E.2d at 888 (citations omitted).

 5. Prejudice

 Defendant must still demonstrate that the trial court’s failure to give an

instruction on necessity prejudiced him:

 Even if a trial court errs by failing to give a requested and
 legally correct instruction, the defendant is not entitled to
 a new trial unless there is “a reasonable possibility that,
 had the error in question not been committed, a different
 result would have been reached at the trial.”

State v. Fletcher, __ N.C. __, __, 807 S.E.2d 528, 537 (2017) (citations omitted). We

hold, on the facts before us, that “there is a reasonable possibility that, had the error

in question not been committed, a different result would have been reached at the

trial out of which the appeal arises.” N.C. Gen. Stat. § 15A-1443(a) (2017).

 III. Conclusion

 We vacate Defendant’s conviction for DWI and remand for a new trial on that

charge. Defendant’s adjudication of responsible for driving left of the center line is

not affected by our holding. If Defendant is re-tried on the DWI charge and he

requests an instruction on the defense of necessity, the trial court shall issue a proper

instruction on the defense of necessity if, when viewed in the light most favorable to

Defendant, the evidence is such that the jury could reasonably find, to its satisfaction,

that Defendant’s actions constituted (1) reasonable action, (2) taken to protect life,

 - 31 -
 STATE V. MILLER

 Opinion of the Court

limb, or health of a person, and (3) no other acceptable choices [were] available.”

Hudgins, 167 N.C. App. at 710–11, 606 S.E.2d at 447 (citation omitted). If the trial

court instructs the jury on necessity, the instruction shall be in accordance with the

established elements of that defense. The same mandate also applies should the trial

court instruct the jury on the defense of duress.

 NEW TRIAL.

 Judges CALABRIA concurs.

 Judge DILLON concurs with separate opinion.

 - 32 -
 No. COA17-405 – STATE v. MILLER

 DILLON, Judge, concurring.

 Our jurisprudence compels us to view the evidence in the light most favorable

to Defendant in determining whether to give the requested instruction. And in

viewing the evidence in such light, we are to determine only whether it is possible

that at least one juror would have concluded that Defendant acted out of necessity or

duress.

 The trial court based its decision not to instruct the jury on necessity/duress

on its conclusion that, though Defendant’s wife testified that she was in fear, there

was no evidence that Defendant, himself, acted out of fear. Regarding this decision,

I agree with the majority that there was enough evidence from which a juror could

have concluded that Defendant was in fear. True, no one specifically testified that

(s)he thought Defendant was in fear. However, there was evidence that Defendant

had just punched a man; the man pulled a gun; in response, Defendant immediately

exclaimed to his wife to “go, go, go, go, go;” and Defendant sped away in the golf cart.

From this evidence, I conclude that at least one juror could have reasonably found

that Defendant acted out of fear. I note the other evidence which strongly suggests

that Defendant was not in fear; however, it is not our job to weigh the evidence.

 I do find some merit in the State’s argument that driving the golf cart in the

direction of and then past the gunman to escape was not the only acceptable means

of escape, but that Defendant and his wife could have simply run in the other

direction. However, the evidence also showed that Defendant’s wife was not a strong
 STATE V. MILLER

 DILLON, J., concurring

runner, that they both had been drinking, and that the gunman was much younger

(around 30 years old) than Defendant (who was 43). Based on this evidence, I must

again conclude that it is reasonably possible that a juror could have concluded that

Defendant reasonably determined that running was not a reasonable alternative to

driving the golf cart in their quest to reach a safe location.

 In conclusion, I agree with the majority’s determination that the trial court

should have given the requested instruction and that its failure to do so warrants a

new trial.

 2